UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| THROUGHPUTER, INC.,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>AMAZON WEB SERVICES, INC.,<br><br>　　　　　Defendant. | Civil Action No. 1:22-cv-01095-RP<br><br>**JURY TRIAL DEMANDED** |

**MOTION OF DEFENDANT AMAZON WEB SERVICES, INC.
TO DISMISS UNDER RULE 12(b)(6) FOR FAILURE TO STATE A CLAIM**

# TABLE OF CONTENTS

                                    **Page**

I.   INTRODUCTION ...................................................................................................1

II.   FACTUAL BACKGROUND...................................................................................2

   A.   Amazon filed patent applications directed to security issues in FPGAs years before ThroughPuter filed the applications for the asserted patents. .................................................................................................2

   B.   Three years after Amazon's patents published and two years after they issued, ThroughPuter filed applications for the asserted patents, changed their titles and abstracts to track Amazon's patents, copied the claims of Amazon's patents, and then filed this lawsuit. ...................................................................................................4

III.   LEGAL STANDARD.............................................................................................10

IV.   THROUGHPUTER COPIED ITS CLAIMS FROM AMAZON, AND THUS DID NOT "INVENT" THE CLAIMED SUBJECT MATTER, RENDERING THE CLAIMS INVALID UNDER § 101 AND NECESSITATING DISMISSAL OF THIS ACTION ..........................................12

V.   CONCLUSION......................................................................................................15

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*Agawam Woolen Co. v. Jordan*,
  74 U.S. 583 (1868)............................................................................................................1, 11

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)........................................................................................................10, 13

*Bd. of Trs. of LeLand Stanford Junior Univ. v. Roche Molecular Sys. Inc.*,
  563 U.S. 776 (2011)..............................................................................................................11

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..............................................................................................................10

*Data Engine Techs. LLC v. Google LLC*,
  906 F.3d 999 (Fed. Cir. 2018)................................................................................................4

*Grecia Est. Holdings LLC v. Meta Platforms, Inc.*,
  No. 6:21-CV-00677-ADA, 2022 WL 2019296 (W.D. Tex. June 6, 2022) ..............................4

*Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*,
  677 F.2d 1045 (5th Cir. 1982) ........................................................................................10, 13

*Packet Intel. LLC v. NetScout Sys., Inc.*,
  No. 2:16-cv-230-JRG, Dkt. 228 (E.D. Tex. Sept. 29, 2017) ..................................................11

*Thaler v. Vidal*,
  43 F.4th 1207 (Fed. Cir. 2022) ............................................................................................11

*Uniloc USA, Inc. v. ADP, LLC*,
  772 F. App'x 890 (Fed. Cir. 2019) ........................................................................................4

*Univ. of Utah v. Max-Planck-Gesellschaft Zur Forderung Der Wissenschaften
  E.V.*, 734 F.3d 1315 (Fed. Cir. 2013)..................................................................................11

**STATUTES**

35 U.S.C. § 101............................................................................................................... *passim*

**OTHER AUTHORITIES**

37 C.F.R. § 1.56....................................................................................................................14

Fed. R. Civ. P. 12(b) ....................................................................................................1, 2, 10

Manual of Patent Examining Procedure § 2001 (9th ed. Rev. 10.2019, June 2020)...............13, 14

U.S. Const. art. I, § 8, cl. 8..........................................................................................................1

I.      INTRODUCTION

"No one is entitled to a patent for that which he did not invent." *Agawam Woolen Co. v. Jordan*, 74 U.S. 583, 602 (1868). Indeed, the Constitution directs Congress to enact laws "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and *Inventors* the exclusive Right to *their respective Writings and Discoveries*." U.S. Const. art. I, § 8, cl. 8 (emphases added). The framers thus explicitly contemplated that Congress would create a system that promotes innovation by offering patent protection only to *inventors*.[1] Consistent with this specific grant of Constitutional authority, Congress enacted Section 101 of the Patent Act, which limits the issuance of patents only to "whoever invents," *i.e.*, the innovators whose hard work contributes meaningfully to the public store of knowledge. The claims that plaintiff ThroughPuter asserts against Amazon[2] in this case offend this core tenet of our patent system.

That is because—based on undisputed admissions in the complaint and public Patent Office records, all of which the Court may properly consider in resolving a Rule 12 motion—ThroughPuter and its principals did not "invent" what they now claim. Instead, a little over a year ago, ThroughPuter filed the applications for the asserted patents, copying verbatim claim language from published patent applications Amazon filed years before. Indeed, ThroughPuter admits in its complaint that the claims it filed in 2021 are "substantially the same" as Amazon's earlier-issued patent claims. To ensure that its copycat claims would issue, ThroughPuter concealed its copying of Amazon's claims from the Patent Office. It rewrote the titles, abstracts, and claims of its earlier

---

[1] James Madison, who is credited for including the Patent and Copyright Clause in the Constitution, explained at the time the clause was included that "[t]he right to useful inventions . . . belong[s] to *the inventors*." (Shamilov Decl., Ex. A at 2 (emphasis added).) And an inventor has always been "[o]ne who finds out something new; one who contrives and produces any thing not before existing; a contriver," as Webster's first dictionary defined the word in 1828. (*Id.*, Ex. B.)

[2] "Amazon" refers to individually and collectively to defendant Amazon Web Services, Inc., and the related corporate entities under the common ownership of Amazon.com, Inc.

1

applications, and then falsely represented to the Patent Office that its amendments added no new subject matter. Because ThroughPuter did not "invent[]" what its patents claim, the claims of the asserted patents are ineligible for patenting and invalid under § 101, and ThroughPuter cannot assert a plausible claim for infringement. Its complaint must be dismissed under Fed. R. Civ. P. 12(b)(6).

## II. FACTUAL BACKGROUND

In this case, plaintiff ThroughPuter asserts two patents—U.S. Patent Nos. 11,347,556 (the "'556 patent") and 11,385,934 (the "'934 patent") (collectively the "asserted patents")—against Amazon Web Services, Inc. ("Amazon"). (Dkt. 1 ("Compl.").) ThroughPuter alleges that field programmable gate array (FPGA) technology of an Amazon cloud computing service called Elastic Compute Cloud (EC2) F1 infringes the patents. (*Id.* ¶ 2.)

### A.   Amazon filed patent applications directed to security issues in FPGAs years before ThroughPuter filed the applications for the asserted patents.

In 2016, Amazon filed two U.S. patent applications: No. 15/279,232 (the "'232 Application"), filed on September 28, 2016, and No. 15/280,624 (the "'624 Application"), filed on September 29, 2016. (*See* Declaration of Saina S. Shamilov ("Shamilov Decl."), Ex. C (U.S. Pat. No. 10,223,317 (the "'317 patent")) at 1, Ex. D (U.S. Pat. No. 10,282,330 (the "'330 patent")) at 1.) The '232 and '624 Applications were published, and thus became publicly available, in March 2018, and issued in March and May 2019 as U.S. Pat. Nos. 10,223,317 and 10,282,330 (the "Amazon patents"), respectively. (*Id.*) ThroughPuter discusses these two patents in its complaint, and attaches them as Exhibits 3 and 4. (Compl. ¶¶ 46-57; *id.*, Ex. 3 ('317 patent), Ex. 4 ('330 patent).)

The Amazon patents, titled "Configurable Logic Platform" and "Configurable Logic Platform with Multiple Reconfigurable Regions," are directed to resolving security issues

2

associated with the use of FPGAs.  (Shamilov Decl., Ex. C ('317 patent) at Abstract, 1:61-2:20; *id.*, Ex. D ('330 patent) at Abstract, 1:65-2:34.)  FPGAs, or Field Programmable Gate Arrays, are hardware chips, or integrated circuits, that can be programmed after deployment to perform different functions.  (*Id.*, Ex. C ('317 patent) at 1:61-2:8.)  That is why they are "Field Programmable."  Programming an FPGA configures the physical structures of the chip, called configurable logic blocks, to perform a desired function.  (*Id.* at 2:24-28, 3:51-62.)  FPGAs can perform their programmed functions much faster than software running on a general-purpose processor that cannot be reconfigured for each desired function.  (*Id.* at 2:21-40.)  Accordingly, FPGAs can be used as hardware accelerators to speed up functions that would otherwise be performed by software.  (*Id.*)

The Amazon patents address security issues that arise when FPGAs are offered as part of a cloud computing service.  (*Id.* at 1:5-14, 2:9-20.)  In such a service, different user programs run in separate "virtual machines" on a collection of shared server computers in the cloud.  (*Id.* at 14:20-40, 14:65-15:11.)  Security issues may arise if one user's configurable logic (*i.e.*, the specific functions programmed in an FPGA by one user) is overwritten or modified by another user, or otherwise interferes with the other user programs running on the same servers.  (*Id.* at 2:9-20.)

To address these security problems, the Amazon patents describe and claim a system in which the user's reconfigurable logic within an FPGA is mediated by "host logic" controlled and provided by the cloud provider.  (*Id.* at 2:41-3:3.)  The host logic on the FPGA ensures that the user's reconfigurable logic does not interfere with the rest of the system and the other applications running on the shared cloud server.  This includes preventing the user's reconfigurable logic on the FPGA from directly accessing the connection to the shared cloud server, also known as the physical interconnect.  (*Id.*)  The host logic also prevents the user's reconfigurable logic from

3

reconfiguring the FPGA itself (and thus potentially erasing the protective "host logic"). (*Id.*)

The claims of the Amazon patents capture this host logic invention, requiring a function that "allows information to be transmitted over the physical interconnect *and prevents the [first or second] reconfigurable logic region from directly accessing the physical interconnect*." (*See id.* at 28:22-28 (emphasis added); *id.*, Ex. D ('330 patent) at 36:43-56 (same).) The claims also recite a host logic function that "provid[es] restricted access to the configuration port from the physical interconnect." (*See id.*, Ex. C ('317 patent) at 28:17-21; *id.*, Ex. D ('330 patent) at 36:38-42 (same).)

### B. Three years after Amazon's patents published and two years after they issued, ThroughPuter filed applications for the asserted patents, changed their titles and abstracts to track Amazon's patents, copied the claims of Amazon's patents, and then filed this lawsuit.

The two asserted patents are related and identify on their face a series of five parent applications, the earliest of which was filed in 2014. (Shamilov Decl., Ex. K ('556 patent) at 1-2 ("Related U.S. Application Data" section); *id.*, Ex. L ('934 patent) at 1-2 (same).) All five parent applications share the same specification and bear an identical title, "Concurrent Program Execution Optimization."[3] (*Id.*, Ex. E at 9-37, Ex. F at 3-31, Ex. G at 8-37, Ex. H at 32-61, Ex. I at 1-30.)

As the title indicates, the parent applications disclose and claim a system for concurrently executing a collection of programs in parallel in a multiprocessor computer. (*See id.*, Ex. J (U.S.

---

[3] The Court may properly consider matters of public record, including communications with the Patent Office, in considering pleadings motions. *Uniloc USA, Inc. v. ADP, LLC*, 772 F. App'x 890, 898 n.3 (Fed. Cir. 2019) ("The prosecution history is part of the intrinsic record of the patent" and "thus subject to judicial notice); *Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1008 n.2 (Fed. Cir. 2018) ("the court may consider 'matters of public record,'" such as "[p]rosecution histories"); *Grecia Est. Holdings LLC v. Meta Platforms, Inc.*, No. 6:21-CV-00677-ADA, 2022 WL 2019296, at *6 (W.D. Tex. June 6, 2022) (communications with the Patent Trial and Appeal Board are "matters of public record" and thus "are subject to judicial notice and appropriate for this Court to consider at the pleading stage").

Pat. No. 9,448,847[4] (the "'847 patent")) at 1.) The identical abstracts explain that the purported invention is "[a]n architecture for a load-balanced groups of multi-stage manycore processors shared dynamically among a set of software applications." (*See id.* at Abstract; *see also id.*, Ex. E at 42, Ex. F at 36, Ex. G at 6, Ex. H at 63, Ex. I at 32 (abstracts in parent applications).) The first sentence of the "Summary" of the invention states that "[a]n aspect of the invention provides systems and methods for arranging secure and reliable, concurrent execution of a set of internally parallelized and pipelined software programs on a pool of processing resources shared dynamically among the programs." (*See id.*, Ex. J ('847 patent) at 2:15-19; *see also id.*, Ex. E at 11, Ex. F at 5, Ex. G at 11, Ex. H at 35, Ex. I at 4.) Consistent with the Summary and Abstract, the parent patents claim systems and methods for optimizing concurrent program execution, such as a "system for prioritizing instances of a software program for execution . . . ." (*See, e.g., id.*, Ex. J ('847 patent) at 21:17-24:21 (claims).)

The detailed description and seven figures describe a system for dynamically assigning tasks from multiple applications executing in parallel to available processing cores in a multiprocessor system: "[T]he multi-stage manycore processor system 1 is shared dynamically among tasks of multiple application programs (apps) and instances (insts) thereof, with, for each of the apps, each task located at one of the (manycore processors) based processing stages 300." (*Id.* at 10:23-27). The specification lists FPGAs among a laundry list of software and hardware including CPUs, GPUs, DSPs and ASPs that *could* be used in implementing the multiprocessor system: "Any of the cores 520 of a processor per FIG. 7 can comprise any types of software program and data processing hardware resources, e.g. central processing units (CPUs), graphics

---

[4] U.S. Patent. No. 9,448,847 is the patent that issued from the first of the five parent applications. (*See* Shamilov Decl., Ex. K at 2 ("Related U.S. Application Data" identifying "application no. 14/318,523, filed on June 27, 2014, now Pat. No. 9,448,847").)

5

processing units (GPUs), digital signal processors (DSPs) or application specific processors (ASPs) etc. and in programmable logic (FPGA) implementation . . . ." (*Id.* at 20:12-18.) But the patent does not describe or claim any technology specific to FPGAs.

In August and September of 2021, ThroughPuter filed two new applications in the parallel processing family, which issued as the asserted patents.[5] (Shamilov Decl., Ex. K ('556 patent) at 1, Ex. L ('934 patent) at 1; Compl., Exs. 1 ('556 patent), 2 ('934 patent).) As filed, the new applications included the same specification as the parallel processing patent applications, but now had a different title: instead of "Concurrent Program Execution Optimization," the title became "Configurable Logic Platform with Reconfigurable Processing Circuitry" to refer to the "configurable logic platform" of Amazon's patents. (Compl., Exs. 1 ('556 patent), 2 ('934 patent); *see also* Shamilov Decl., Ex. M ('556 patent file history) at 54 (showing title of "Concurrent Program Execution Optimization"), 45 (showing new title of "Configurable Logic Platform with Reconfigurable Processing Circuitry"); Shamilov Decl., Ex. N ('934 patent file history) at 19, 10.) ThroughPuter then filed an amendment and changed the abstracts and claims of the parent specification to copy and appropriate the inventions in Amazon's '330 and '317 patents.

For example, as shown in the screenshots below taken from the file histories of the two new applications, ThroughPuter deleted the *entire* Abstract from the parent applications, and inserted a new Abstract:

---

[5] The '556 patent issued from a patent application filed on August 31, 2021. (Shamilov Decl., Ex. K at 1.) The asserted '934 patent issued from a patent application that was filed on September 9, 2021. (*Id.*, Ex. L at 1.)

6

[Side-by-side comparison of two "AMENDMENTS TO THE SPECIFICATION" documents showing amendments to the Abstract with strikethroughs and highlighted additions]

(Shamilov Decl., Ex. M ('556 patent file history) at 3 (annotated); *id.*, Ex. N ('934 patent file history) at 29 (annotated).)  In doing so, ThroughPuter changed the focus of the asserted patents from an "architecture for a load balanced group of multi-stage manycore processors shared dynamically among a set of software applications []" that ThroughPuter purportedly invented, to "[a] configurable logic platform" that resolves security issues, including by "providing restricted access to the configuration port" and "prevent[ing] the respective reconfigurable logic region from directly accessing the physical interconnect" invented by Amazon.  (*Id.*)

In its amendment, ThroughPuter also changed the claim language to recite Amazon's inventions.  For example, ThroughPuter cancelled the pending claim of the '934 patent application, which recited "[a] method for prioritizing instances of a software program for execution" and replaced it with a new claim reciting verbatim the language from claim 1 of Amazon's '317 patent. (*Compare id.*, Ex. N ('934 patent file history) at 30 *with id.* at 64.)  Likewise, for the application that led to the asserted '556 patent, ThroughPuter cancelled the pending claim, and replaced it with a new claim that is a verbatim copy of claim 1 of Amazon's '330 patent.  (*Compare id.*, Ex. M ('556 patent file history) at 4-5 *with id.* at 43.)

7

That the claims of the asserted patents are mere copies of Amazon's earlier-filed claims is undisputed. The tables below, which appear without annotation in ThroughPuter's own complaint (Compl. ¶¶ 50, 54), include side-by-side comparisons of the representative claims of ThroughPuter's asserted patents and the near identical claims of the Amazon patents, and confirm that ThroughPuter copied Amazon's claims and made a few superficial changes (in red) that do not substantively change the scope of the claims. ThroughPuter itself agrees that the changes below are superficial, as it alleges in its complaint that there is "substantial identity" between both claim sets, and the asserted patents claim "substantially the same technology" as Amazon's patents. (*Id.*)

| ThroughPuter's '934 patent, Claim 1 | Amazon's '317 patent, Claim 1 |
|---|---|
| A configurable logic platform, the configurable logic platform comprising: | A configurable logic platform, the configurable logic platform comprising: |
| a physical interconnect for connecting the configurable logic platform to a processor; | a physical interconnect for connecting the configurable logic platform to a processor; |
| a reconfigurable logic region **of an FPGA** comprising logic blocks that are configured based on configuration data; | a reconfigurable logic region comprising logic blocks that are configured based on configuration data; |
| a configuration port for applying the configuration data to the reconfigurable logic region so that the reconfigurable logic region is configured based on configuration data; | a configuration port for applying the configuration data to the reconfigurable logic region so that the reconfigurable logic region is configured based on configuration data; |
| a **reconfiguration logic function** accessible via transactions of the physical interconnect, the **reconfiguration logic function** in communication with the configuration port, the **reconfiguration logic function** providing only restricted access to the configuration port from the physical interconnect; and | a **control plane function** accessible via transactions of the physical interconnect, the **control plane function** in communication with the configuration port, the **control plane function** providing only restricted access to the configuration port from the physical interconnect; and |
| **an interface function** accessible via transactions of the physical interconnect, the **interface function** providing an interface to the reconfigurable logic region which allows information to be transmitted over the physical interconnect and prevents the reconfigurable logic region from directly accessing the physical interconnect, | **a data plane function** accessible via transactions of the physical interconnect, the **data plane function** providing an interface to the reconfigurable logic region which allows information to be transmitted over the physical interconnect and prevents the reconfigurable logic region from directly accessing the physical interconnect, |

| | |
|---|---|
| wherein the **reconfiguration logic function** is implemented in the reconfigurable logic region. | wherein the **control plane function** is implemented in the reconfigurable logic region. |

| ThroughPuter's '556 patent, Claim 1 | Amazon's '330 patent, Claim 1 |
|---|---|
| a configuration port for applying the **first and second** configuration data to the first and second reconfigurable logic regions so that the first reconfigurable logic region is configured based on the **first** configuration data corresponding to the first reconfigurable logic region and the second reconfigurable logic region is configured based on the **second** configuration data corresponding to the second reconfigurable logic region; | a configuration port for applying the configuration data to the first and second reconfigurable logic regions so that the first reconfigurable logic region is configured based on the configuration data corresponding to the first reconfigurable logic region and the second reconfigurable logic region is configured based on the configuration data corresponding to the second reconfigurable logic region; |
| **a reconfiguration logic function** accessible via transactions of the physical interconnect, the **reconfiguration logic function** in communication with the configuration port, the **reconfiguration logic function** providing restricted access to the configuration port from the physical interconnect; | **a control plane function** accessible via transactions of the physical interconnect, the **control plane function** in communication with the configuration port, the **control plane function** providing restricted access to the configuration port from the physical interconnect; |
| a first **interface function** accessible via transactions of the physical interconnect, the first **interface function** providing an interface to the first reconfigurable logic region which allows information to be transmitted over the physical interconnect and prevents the first reconfigurable logic region from directly accessing the physical interconnect; | a first **data plane function** accessible via transactions of the physical interconnect, the first **data plane function** providing an interface to the first reconfigurable logic region which allows information to be transmitted over the physical interconnect and prevents the first reconfigurable logic region from directly accessing the physical interconnect; |
| a second **interface function** accessible via transactions of the physical interconnect, the second **interface function** providing an interface to the second reconfigurable logic region which allows information to be transmitted over the physical interconnect and prevents the second reconfigurable logic region from directly accessing the physical interconnect; and | a second **data plane function** accessible via transactions of the physical interconnect, the second **data plane function** providing an interface to the second reconfigurable logic region which allows information to be transmitted over the physical interconnect and prevents the second reconfigurable logic region from directly accessing the physical interconnect; and |
| **logic** configured to apportion bandwidth of the physical interconnect among at least the first **interface function** and the second **interface function**. | **arbitration logic** configured to apportion bandwidth of the physical interconnect among at least the first **data plane function** and the second **data plane function**. |

9

The Patent Office allowed ThroughPuter's copycat claims without ever knowing that ThroughPuter copied them from Amazon because ThroughPuter falsely represented to the Patent Office that its amendments to the title, abstract, and claims "introduce[d] no new matter," and concealed from the Patent Office that it copied the claims from another patent in violation of Patent Office regulations that require an applicant to inform the Patent Examiner if it copies claims from another patent. (Shamilov Decl., Ex. M ('556 patent file history) at 11; *id.*, Ex. N ('934 patent file history) at 32.) Indeed, ThroughPuter never disclosed the issued Amazon patents to the examiner at all.[6]

## III.   LEGAL STANDARD

To survive a Rule 12 motion to dismiss, a complaint must allege facts that, when taken as true, "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although the Court must generally accept the plaintiff's factual allegations as true, this tenet "is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Similarly, the Court need not accept as true "conclusionary allegations" devoid of factual support. *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982) (citation omitted).

Section 101 of the Patent Act codifies the Constitutionally-mandated requirement that a patent may be awarded only to the *inventor* of the subject matter claimed: "Whoever *invents or discovers* any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, *may obtain a patent therefor*, subject to the conditions and

---

[6] ThroughPuter's patent counsel was fully aware of Amazon's patents when it drafted the asserted claims. The two asserted patents each cite Amazon's U.S. Patent Publication 2018/0089119, the publication for Amazon's '330 patent, on their face, and ThroughPuter identified the publication in an information disclosure statement (IDS) for the '934 patent application, on the same day that the application was filed. (Shamilov Decl., Ex. N ('934 patent file history) at 4.)

requirements of this title." 35 U.S.C. § 101 (emphasis added); *Packet Intel. LLC v. NetScout Sys., Inc.*, No. 2:16-cv-230-JRG, Dkt. 228 at 14 n.1 (E.D. Tex. Sept. 29, 2017) ("[t]he 'Whoever invents' language of 35 U.S.C.A. § 101 retains the prohibition on granting a patent to one who derived the invention from another" (citation omitted)).  The Supreme Court thus long ago held that "[n]o one is entitled to a patent for that which he did not invent." *Agawam Woolen Co. v. Jordan*, 74 U.S. 583, 602 (1868).  Instead, the "rights in an invention *belong to the inventor*." *Bd. of Trs. of LeLand Stanford Junior Univ. v. Roche Molecular Sys. Inc.*, 563 U.S. 776, 785 (2011) (emphasis added).  An inventor is not a copier.  *See Univ. of Utah v. Max-Planck-Gesellschaft Zur Forderung Der Wissenschaften E.V.*, 734 F.3d 1315, 1323 (Fed. Cir. 2013) ("It is axiomatic that inventors are the individuals that conceive of the invention."); *Thaler v. Vidal*, 43 F.4th 1207, 1211 (Fed. Cir. 2022) (noting requirement that an inventor must declare himself or herself "to be the *original* inventor") (emphasis added); *Application of Sarkar*, 588 F.2d 1330, 1333 (C.C.P.A. 1978) ("The words 'Whoever invents' in § 101 are used in the sense of 'whoever originates'").

Based on ThroughPuter's admissions in the complaint and public Patent Office records, ThroughPuter did not *invent* what it now claims; ThroughPuter copied it from Amazon.  The claims of the asserted patents are therefore ineligible for patenting under § 101 and invalid, and this action must be dismissed for failure to state a claim.[7]

---

[7] The bar on awarding patents to non-inventors has long been enforced, before the enactment of the America Invents Act (AIA), through pre-AIA Section 102(f).  Though the AIA eliminated § 102(f) as a statutory provision, the fundamental tenet that patents may be awarded only to inventors remains, as "[b]oth the Constitution and § 101 still specify that a patent may only be obtained by the person who engages in the act of inventing."  Joe Matal, *A Guide to the Legislative History of the America Invents Act:  Part I of II*, 21 Fed. Circuit Bar J. 435, 451–52 (2012).

**IV. THROUGHPUTER COPIED ITS CLAIMS FROM AMAZON, AND THUS DID NOT "INVENT" THE CLAIMED SUBJECT MATTER, RENDERING THE CLAIMS INVALID UNDER § 101 AND NECESSITATING DISMISSAL OF THIS ACTION**

The asserted patents are invalid because it is apparent from the face of ThroughPuter's pleadings that it did not invent the subject matter claimed in the asserted patents, but took it from Amazon. 35 U.S.C. § 101 ("Whoever *invents* . . . *may obtain a patent* therefor . . . .") (emphases added). As explained above, Amazon filed its patent applications in 2016, those patent applications published in 2018, and they issued as patents in 2019. (*See supra*, at p. 2.) Three years *after* Amazon's patent applications published, and over two years *after* they issued as patents, Throughputer filed the asserted claims—which *mirrored* those of Amazon's patents. (*See supra*, at pp. 6, 8-9.)

ThroughPuter's complaint itself confirms that the asserted claims are copies of Amazon's inventions. The complaint shows that *every* limitation of ThroughPuter's asserted patent claims is a nearly verbatim copy of a limitation in Amazon's patent claims and the text of the two sets of claims includes only a few differences that do not substantively change the scope of the claims. (*See supra*, at pp. 8-9.) ThroughPuter admits as much: it alleges that there is "substantial identity" between Amazon's and ThroughPuter's patent claims, and that the asserted patents claim "substantially the same technology" as Amazon's patents. (Compl. ¶¶ 50, 54.)

The history of the asserted patents confirms that ThroughPuter did not invent the claimed subject matter. Whereas each of ThroughPuter's five parent applications is directed to parallel processing of multiple applications in a multiprocessor system (*see supra*, at pp. 4-6), the asserted claims, in contrast, are directed to resolving security issues arising specifically from the use of FPGAs within a cloud system (*see supra*, at pp. 6-9). There is no reference or explanation in any of ThroughPuter's parent applications of resolving security issues arising from use of FPGAs, for

example, by preventing a reconfigurable logic region from directly accessing the physical interconnect, or by having a reconfiguration logic function provide restricted access to the configuration port from the physical interconnect. (*See* Compl., Ex. 1 ('556 patent) at claim 1, Ex. 2 ('934 patent) at claim 1; *see also* Shamilov Decl., Exs. E-I (parent applications).) The complete absence of supporting disclosure in ThroughPuter's parent applications confirms that ThroughPuter did not invent what it now claims to have invented—Amazon did—and the Court should dismiss this case under § 101.

No allegation in ThroughPuter's complaint changes this conclusion. ThroughPuter alleges that Mark Sandstrom, its President, "is the sole and true inventor" of each asserted patent. (Compl. ¶¶ 6, 63, 107.) But this is a legal conclusion for which ThroughPuter provides no *factual* support. The Court need not credit such a conclusory assertion. *Iqbal*, 556 U.S. at 678; *Kaiser Aluminum*, 677 F.2d at 1050. Indeed, for ThroughPuter's legal conclusion to be true, the Court would have to accept a truly inconceivable story: ThroughPuter independently came up with the claimed inventions before Amazon, but waited for years to claim them, even though Amazon's nearly identical claims were filed and publicly available *years* before ThroughPuter filed its asserted claims, ThroughPuter was aware of Amazon's patent applications, and ThroughPuter's earlier applications in the same patent family are directed to completely different subject matter. The only *plausible* conclusion is that ThroughPuter did not invent what it claims and instead copied its claims from Amazon.

This conclusion is further confirmed by the fact that ThroughPuter deliberately, and impermissibly, hid the fact that it copied Amazon's claims from the Patent Office. When copying a claim from another patent, the Manual of Patent Examining Procedure ("MPEP") requires the applicant to identify the source of the copied claims: "Where claims are copied or substantially

13

copied from a patent, 37 CFR 41.202(a) requires the applicant, at the time he or she presents the claim(s), to identify the patent and the numbers of the patent claims." MPEP § 2001.06(d) (9th ed. Rev. 10.2019, June 2020). Disclosure is required because, as the MPEP makes clear, such a patent is "material information," and "failure to inform the USPTO of such information may violate the duty of disclosure." *Id.* Both the MPEP, and binding federal regulations, impose this duty of disclosure, requiring that "[e]ach individual associated with the filing and prosecution of a patent application" must "disclose to the Office all information known to that individual to be material to patentability as defined in this section." MPEP 2001.04 (9th ed. Rev. 10.2019, June 2020); 37 C.F.R. § 1.56 (same).

Here, while ThroughPuter undeniably copied Amazon's claims as explained above, ThroughPuter failed to disclose that fact to the Examiner in direct violation of Patent Office requirements. Indeed, not only did ThroughPuter fail to disclose its copying, it also expressly misrepresented to the Patent Office that the "amendments [it sought to the parent applications] introduce[d] no new matter." (*See supra*, at p. 10.) To the contrary, and as shown above, ThroughPuter's amendments entirely replaced the titles, the abstracts and the claims of the asserted patents. (*See supra*, at pp. 6-9.) And in doing so, ThroughPuter transformed the focus of its patents from parallel processing of multiple applications in a multiprocessor system, to a completely different technology, unrelated to any disclosure in ThroughPuter's parent applications—resolving security issues on an FPGA platform. (*Id.*) Thus, ThroughPuter's statement that its amendments introduced "no new matter" is, on its face, false, and only evidences ThroughPuter's deliberate intention to hide its copying from the Patent Office. As a result, the Patent Office allowed the asserted patents without knowing the true source of their claims. But because ThroughPuter did not invent what its patents claim—Amazon did—the Court should find the allowed claims

ineligible and invalid under § 101.  This action thus must be dismissed.

## V. CONCLUSION

The patents ThroughPuter assert in this action are invalid because ThroughPuter, and the inventor named in the patents, did not invent the claimed subject matter, but copied it from Amazon.  Accordingly, Amazon asks the Court to dismiss Plaintiffs' complaint with prejudice under Rule 12(b)(6).

Dated:   January 5, 2023           Respectfully submitted,

*/s/ J. David Hadden*
J. David Hadden, CSB No. 176148
Email: dhadden@fenwick.com
(Admitted W.D. Tex.)
Saina S. Shamilov, CSB No. 215636
Email: sshamilov@fenwick.com
(Admitted W.D. Tex.)
Ravi R. Ranganath, CSB No. 272981
Email: rranganath@fenwick.com
(Admitted W.D. Tex.)
Johnson K. Kuncheria, TX Bar No. 24070092
Email: jkuncheria@fenwick.com
(Admitted W.D. Tex.)
FENWICK & WEST LLP
Silicon Valley Center
801 California Street
Mountain View, CA  94041
Telephone:    650.988.8500
Facsimile:     650.938.5200

Jessica M. Kaempf (WSBN 51666)
(Admitted W.D. Tex.)
Email: jkaempf@fenwick.com
FENWICK & WEST LLP
1191 2nd Avenue, 10th Floor
Seattle, WA 98101
Telephone: 206.389.4510
Facsimile: 206.389.4511

Counsel for Defendant AMAZON WEB SERVICES, INC.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and copy of the above and foregoing document has been served to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system.

Dated:   January 5, 2023

                                      */s/ J. David Hadden*
                                      J. David Hadden